# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 19-182V
Filed: April 16, 2021
PUBLISHED

| | |
|---|---|
| MICHAEL KAHN,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Special Master Horner<br><br><br>Shoulder Injury Related to<br>Vaccine Administration; SIRVA;<br>Onset |

*Jessica Anne Olins*, Maglio Christopher & Toale, PA, Washington, DC, for petitioner.
*Matthew Murphy*, U.S. Department of Justice, Washington, DC, for respondent.

## Findings of Fact[1]

      On January 31, 2019, petitioner, Michael Kahn, filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10-34 (2012), alleging that as a result of an October 4, 2016 influenza ("flu") vaccination he has "suffered a [Shoulder Injury Related to Vaccine Administration ("SIRVA")] to the left shoulder which is superimposed on generalized cervical spine sequelae from his remote [motor vehicle accident] and other degenerative changes." (ECF No. 1, p. 2.) He alleges that he suffers both SIRVA and brachial neuralgia caused or significantly aggravated by his vaccination. (*Id.*)

      On September 30, 2020, petitioner filed a motion for a ruling on the record seeking a finding of fact regarding the onset of petitioner's alleged shoulder injury. (ECF No. 39.) Specifically, "[p]etitioner respectfully requests this Court find that he has established by preponderant evidence that his left shoulder pain began within 48 hours of vaccine administration and that his left shoulder pain was as a result of his vaccine administration, as noted by his providers." (*Id.* at 10.) For all the reasons discussed

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

1

below, I find that there is not preponderant evidence that petitioner experienced an onset of shoulder pain within 48 hours of his October 4, 2016 flu vaccination.

## I.   Procedural History

This case was initially assigned to the Special Processing Unit.  (ECF No. 5.)  Petitioner initially filed records marked as Exhibits 1-10, an affidavit marked as Exhibit 11, and his first Statement of Completion on February 15, 2019.  (ECF Nos. 7-9.)[2]  Subsequently, however, petitioner filed additional records from April to November of 2019 marked as Exhibits 12-16, and a supplemental affidavit marked as Exhibit 17.  (ECF Nos. 10, 16, 19.)  Petitioner filed a second Statement of Completion on November 12, 2019.  (ECF No. 21.)

Respondent filed his Rule 4 report on January 28, 2020.  (ECF No. 26.)  Respondent's position was that the case was not appropriate for compensation.[3]  Respondent set forth a number of reasons why he contends petitioner's injury does not meet the regulatory definition of SIRVA.  (*Id.* at 18-20.)  Respondent also contended that petitioner had failed to meet his burden with respect to a cause-in-fact claim for brachial neuralgia.  (*Id.* at 20.)

In light of respondent's report, the case was removed from the Special Processing Unit and reassigned to Special Master Roth.  (ECF Nos. 27-28.)  Additional records were filed as Exhibits 18-22 on March 20, 2020.  (ECF No. 30.)  During a status conference held April 1, 2020, Special Master Roth discussed the record evidence at length and noted petitioner's affidavit evidence to be in conflict with the contemporaneous medical records.  She advised that no monies should be spent on expert analysis until the factual discrepancies are resolved.  (ECF No. 31, p. 3.)

Petitioner subsequently filed further evidence marked as Exhibits 23-25 before later filing the above-referenced motion for a ruling regarding onset based on the written record on September 30, 2020.  (ECF Nos. 36, 38-39.)  Respondent filed his response on November 30, 2020, and petitioner filed a reply on December 4, 2020.  (ECF Nos. 41-42.)

The case was reassigned to my docket on January 29, 2021.  (ECF No. 44.)  On February 1, 2021, I advised the parties that "I have reviewed the docket of this case and the pending motion. The parties have had a full and fair opportunity to develop the

---

[2] In filing his exhibits, petitioner misidentified the exhibits in the docket text.  The exhibits referenced throughout this ruling are based on their bates stamping and not by the docket text.

[3] Respondent's report incorrectly states that petitioner did not plead any claim of significant aggravation.  (ECF No. 26, p. 1.)  While it is true that the petition focuses in substantial part on the factual allegations relating to a new onset of shoulder symptoms following vaccination, petitioner did explicitly plead that "Petitioner's loss is compensable under the National Childhood Vaccine Injury Act of 1986, codified as amended at 42 U.S.C. §§ 300aa-10 to 34, inasmuch as the vaccination administered actually caused, or, alternatively, significantly aggravated, Petitioner's injuries."  (ECF No. 1, p. 2.)

record and I intend to resolve the pending motion on the existing record. Vaccine Rule 8(d); Vaccine Rule 3(b)(2)." (ECF No. 45.)

**II.    Factual History**

    a.  **As Contained in the Medical Records**

Petitioner has a history of atypical chest pain, cervical radiculopathy, plantar fasciitis, hypogonadism, insomnia, fatigue, dermatitis, myocardial infarction, anxiety, type 2 diabetes, coronary artery disease, benign hypertension. (Ex. 1, p. 3; Ex. 2, p. 25; Ex. 3, p. 7; Ex. 10, p. 147.)

Petitioner had a motor vehicle accident on March 18, 2009. (Ex. 16, p. 6; Ex. 2, p. 23.) He first sought treatment at Ross Center for Orthopedics on December 2009 for right arm paresthesias and pain in his neck, trapezius muscles, upper back, and mid back. (Ex. 16, p. 6.) Petitioner was treated for multi-level cervical, thoracic and lumbar disc protrusions, bilateral upper extremity radiculitis, and radiculopathy. (*Id.* at 7.) Petitioner had acupuncture treatment and steroid injections for his pain. (*Id.* at 8.) Dr. Laura Ross wrote that petitioner sustained permanent injuries as a direct result of his car accident. (*Id.* at 9.) On January 7, 2010, petitioner had a consultation with Dr. Peter F. Arino regarding pain in his cervical area that radiates to his shoulder blades bilaterally that occurred since his accident. (Ex. 2, p. 23.) Petitioner was assessed with acute chronic neck pain with cervical radiculitis/radiculopathy secondary to multiple disc herniations, cervical facet syndrome, and trapezius muscle spasms. (*Id.* at 25.)

Additionally, petitioner sought consistent chiropractic care with Dr. David Bauer for neck and shoulder pain and muscle spasms in 2009 and 2010. (Ex. 4, pp. 3-8, 23-37.) Petitioner was discharged from chiropractic care on November 24, 2010. (Ex. 4, p. 42.) He returned on May 10, 2012 with low back pain after playing tennis and the plan was for petitioner to seek treatment twice a week for two weeks. (Ex. 4, p. 42.) On May 17, 2012, petitioner had a further evaluation with Dr. Ross, where he complained of persistent spasms in his back since his accident. (Ex. 16, p. 4.) Petitioner was assessed as having multi-level cervical, thoracic and lumbar disc protrusions with worsening of his lumbar pain, mild spinal stenosis, degenerative joint disease with slight impingement, mild left carpal tunnel syndrome, and bilateral radiculopathies. (*Id.*)

Petitioner received a flu vaccination to his left deltoid on October 4, 2016 following his visit with Dr. David T. Gigliotti,[4] his primary care provider ("PCP"). (Ex. 1, pp. 4, 10; Ex. 10, p. 160.) According to a phone note, dated October 4, 2016, from Mary Marano, petitioner needed labs ordered. (*Id.* at 159.) There was a phone note dated October 10, 2016, stating that petitioner "needs haic [sic] sma24 [sic] in feb, fasting, please arreange [sic] and inform, tell him I just phoned in a bunch of the invoakanna [sic] at the 100mg dose." (Ex. 10, p. 168.) Additionally, there was another

---

[4] The records noted that this visit was a "nurse visit: nurse only," but also reported that petitioner's vitals were recorded "per Dr. G." (Ex. 10, p. 160.)

phone note dated October 24, 2016 that stated: "needs prednisone 20mg." (Ex. 10, p. 169.)

On October 27, 2016, petitioner saw Dr. Mary Ann Sciamanna, acupuncturist. (Ex. 3, pp. 7, 12.) At this visit, petitioner reported that his left shoulder pain had become worse two months before, and that his left arm numbness and tingling had started a week earlier. (*Id.*) Petitioner indicated that he had current problems of diabetes, heart disease, high blood pressure, spine disc bulge or herniation and that he was taking metformin and prednisone. (*Id.* at 7-8.) Petitioner also described his exercise routine which included lifting twice a week and walking rapidly for one to eight miles, six times a week. (*Id.* at 9.) Petitioner additionally indicated that his pain level was 8/9 and that his pain worsened when he turns his head to the left. (*Id.* at 12.)

On November 10, 2016, petitioner saw Fred Chang at the CARE center of South Jersey with neck pain as a result of being in one position too long and denied any trauma. (Ex. 4, p. 1.) The onset of pain was noted as November 9, 2016. Upon examination, it was noted that left shoulder was high and positive for left shoulder depression. (*Id.*) Petitioner was diagnosed with unspecified disorder of back and petitioner's condition was of insidious onset. (*Id.* at 2.) It was noted that petitioner denied any aggravation of injury, but that petitioner had severe limited range of motion around the cervical and cervicothoracic regions. (*Id.* at 45.) Petitioner also saw Steve Alberti, chiropractor, for reevaluation and cervical, thoracic and lumbar adjustments on the same day. (Ex. 4, p. 44.) It was noted that petitioner presented with new complaints with onset of November 9, 2016 and was diagnosed with cervical region radiculopathy. (*Id.*)

On November 15, 2016, petitioner returned to see Dr. Sciamanna for left shoulder pain in his upper arm and half of his forearm, thinking that he was "manipulated a little too hard." (Ex. 3, p. 5.) Dr. Sciamanna noted that petitioner had left arm weakness and difficulty lifting his arms. (*Id.*) Three days later, petitioner returned and stated that he had a painful night and that tingling and numbness were still present in his left arm. (*Id.*) Petitioner saw Dr. Sciamanna again on November 22, 2016, where he indicated that he felt pain down his forearm and concentrated pain at his deltoid region. (*Id.*) Additionally, petitioner had an x-ray on November 18, 2016. (Ex. 3, p. 10; Ex. 9, pp. 6-7.) The conclusion was degenerative arthritis and calcific bursitis. (Ex. 3, p. 11.)

On November 29, 2016, petitioner saw Dr. Gigliotti for a follow up appointment to have a neck MRI performed. Petitioner complained of progressive neck and shoulder pain over the past two weeks. (Ex. 10, p. 172.) It was noted that petitioner's symptoms were aggravated by chiropractor treatment. (*Id.*) Petitioner was diagnosed and treated for left cervical radiculopathy and shoulder pain. An MRI was ordered and petitioner was referred for an orthopedic evaluation. (*Id.* at 174.) Petitioner also sought chiropractic treatment on his left shoulder on the same day at Oliver Chiropractic, a new practice. (Ex. 5, pp. 4-5.) Petitioner indicated that he had left shoulder pain that started

4

about six weeks ago in October.  (*Id.* at 5.)  He had about six visits with this chiropractor subsequently.  (*Id.* at 6.)

Petitioner was treated by Dr. Ressler on February 2, 2017 for pain management of ongoing complaints of beck pain with radiation to the left upper extremity.  (Ex. 2, p. 12.)  Dr. Ressler noted that petitioner had a long history of cervical pain which was treated in 2010 and that petitioner "started to experience cervical pain again with mild radiation to the left upper extremity coincidentally after having a flu shot in October 2016."  (*Id.*)  Additionally, Dr. Ressler noted that petitioner indicated he started experiencing "soreness at the site of the injection with concomitant tingling in the left arm radiating to the left 5th finger."  (*Id.*)  Petitioner's January 27, 2017 cervical spine MRI revealed disc protrusions with dorsal ligamentum flavum hypertrophy with moderate narrowing of the central canal, moderate to severe stenosis, and uncovertebral joint hypertrophy.  (*Id.* at 15.)  Petitioner chose to proceed with medication and injection therapy treatment for his pain.  (*Id.*)  Petitioner returned to South Jersey Pain Consultants on February 7, 2017 for his cervical epidural steroid injection.  (*Id.* at 5.)

Petitioner visited South Jersey Pain Consultants again on April 10, 2017.  (Ex. 13, p. 4.)  It was noted that petitioner still had mild restriction of his cervical range of motion and he complained of tenderness over his right greater trochanter and pain in left upper extremity.  (*Id.*)   On April 21, 2017 received an injection for his diagnosis of trochanteric bursitis.  (*Id.* at 2.)

On May 25, 2017, petitioner saw Dr. Daniel J. Ragone, a physiatrist for EMG/NCS of the paraspinal muscles and right upper extremity.  (Ex. 7, p. 2.)  Dr. Ragone noted that petitioner complained of pain, numbness, and tingling into his right deltoid, forearm, and right hand.  Additionally, petitioner reported his weakness and neck pain all started after getting a flu shot on October 4, 2016.  (*Id.*)  The impression of the study was that petitioner had chronic right cervical radiculopathy, but the results were not consistent with peripheral neuropathy, brachial plexopathy, or myopathy.  (*Id.* at 3.)  There were no notations specifically mentioning any left arm or shoulder pain.

However, petitioner was referred to Dr. Ragone again and on June 5, 2017, petitioner was evaluated for left shoulder, arm, and hand pain.  (Ex. 7, p. 5.)  It was noted that petitioner had ongoing pain for eight months and that petitioner stated that "he experienced an aching pain at the tip of his left shoulder a few days after receiving a flu shot in October 2016."  (*Id.*)

Petitioner began physical therapy on June 7, 2017, where he reported an eight-month history of left shoulder pain following a flu shot.  (Ex. 6, p. 1.)   It was recorded that petitioner's onset of left shoulder pain was following a flu shot on October 4, 2016.  (*Id.*)  He was discharged from physical therapy on August 8, 2017.  (*Id.* at 13.)

5

### b. As Presented in Additional Evidence

#### i. Petitioner's Affidavit

In his supplemental affidavit, petitioner stated that in March 2009, he was involved in a motor vehicle accident that caused a "temporary, dull pain [his] neck region, radiating stiffness down into both of [his] shoulder blades, with occasional tingling into [his] right hand." (Ex. 17, p. 1.) Petitioner affirmed that by 2011, he was completely asymptomatic and returned to his daily activities including going to the gym at his usual frequency. And moreover, he indicated that from 2011 through October 2016, petitioner had intense gym workouts and would frequently visit Jersey Shore to swim. (*Id.* at 1-2.)

Petitioner stated that he felt immediate pain in his left shoulder area following his October 4, 2016 influenza vaccination and within several days, he began experiencing constant and persistent pain. (*Id.* at 2.) A week following vaccination, petitioner felt that his pain went beyond muscular and into his shoulder bone, and two weeks after vaccination, petitioner was in "constant extreme pain." Petitioner affirmed that three weeks after vaccination, he contacted his PCP regarding his pain and was told to take Motrin for pain relief, which he did, but his pain did not subside. (*Id.*) Then a few days later, he spoke to his PCP again on October 24, 2016 and was prescribed prednisone for his pain. (*Id.* at 3.)

Petitioner indicated that he began acupuncture treatment at the end of October 2016 and chiropractic treatment in late November 2016 for left shoulder and arm pain management. (*Id.*) Additionally, he received a cortisone injection at the end of November, which temporarily relieved his shoulder pain. (Ex. 17, p. 3.) Petitioner also experienced discomfort in his neck that radiated down his lower left arm. Petitioner affirmed that he returned to the gym by the end of January 2017, but could not perform any low weight shoulder exercises. (*Id.* at 4.) Petitioner averred that he constantly experienced sharp, burning, radiating left shoulder and arm pain into late spring of 2017. (*Id.*) Petitioner stated that different from his pain after his 2009 accident, where he only lessened his workout and continued to swim, this shoulder pain prevented him from working out, swimming, and sleeping. (*Id.*)

#### ii. Dr. Gigliotti's Affidavit

Additionally, Dr. David Gigliotti submitted a letter, dated March 12, 2020, indicating that he "ha[s] a very clear recollection of the flu shot administered to Mr. Kahn on October 4, 2016 and the subsequent conversations that [they] had following the administration of the shot." (Ex. 21, p. 1.) Dr. Gigliotti stated that these conversations happened after hours by telephone and therefore were not part of the records.[5]  Also, Dr. Gigliotti recalled that several days after receiving the flu vaccination, petitioner

---

[5] However, there were phone notes that were filed. The notes did not mention anything about complaints of left shoulder pain relating to the flu vaccination. The second note did coincide with both petitioner's and Dr. Gigliotti's recollections of prednisone being prescribed.

6

reported that he felt extreme pain in his left shoulder like "having been struck with a hammer." Petitioner was initially told to take Motrin, but thereafter, petitioner contacted Dr. Gigliotti again several days after indicating no pain relief. (*Id.*) Dr. Gigliotti prescribed petitioner with prednisone and recalled that it significantly improved his pain. (*Id.*)

### iii. Dr. Sciamanna's Affidavit

Dr. Sciamanna wrote a letter dated August 20, 2020 to clarify the progress notes of petitioner's visit on October 27, 2016. (Ex. 23, p. 3.) Dr. Sciamanna stated that "[w]hen determining a treatment, it is helpful to know any prior injuries that may have affected the current pain level. My notes report that 6 years ago there was an MVA that led to an MRI showing cervical disc disease." (*Id.*) She further indicated that she "inquired about [petitioner's] neck pain and was told the pain present about 2 months, but was getting worse and now seemed to be also in the shoulder." (*Id.*) Dr. Sciamanna indicated that she was unaware of any trauma to the shoulder and that she would have noted such in the discussion. She concluded that "the intent of the pain description was to determine a timeline of when the neck pain started, with less focus on the shoulder itself. It is entirely possible that the patient had neck pain and the shoulder pain as separate entities." (*Id.*)

### iv. Donna Jones Affidavit

Petitioner filed an affidavit from Donna Lee Jones, an attorney that worked with petitioner since 2013. (Ex. 24.) Ms. Jones indicated that in early November of 2016, she noticed that petitioner was "holding his arm in pain, wincing, and repeating that he needed some icy hot." (*Id.*) When she asked him what was wrong, petitioner said "it was aching and painful, and that it was difficult to lift his arm." Ms. Jones asked petitioner whether he received a flu shot and told petitioner about SIRVAs and the Vaccine Program. (*Id.*) Ms. Jones averred that prior to early November 2016, petitioner had never complained about arm pain. (*Id.* at 2.) Ms. Jones contacted the Maglio Christopher & Toale firm to refer petitioner. (Ex. 25.)

## III.  Standards of Adjudication

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. § 300aa-11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 300aa-13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (it is within the special master's discretion to determine

whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such a determination is evidenced by a rational determination). Petitioner must prove by a preponderance of the evidence the factual circumstances surrounding her claim.  § 300aa–13(a)(1)(A).

Medical records that are created contemporaneously with the events they describe are presumed to be accurate and complete (i.e., presenting all relevant information on a patient's health problems).  *Cucuras v. Sec'y of Health & Human Servs.,* 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Doe v. Sec'y of Health & Human Servs.*, 95 Fed. Cl. 598, 608 (2010) ( "[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd, Rickett v. Sec'y of Health & Human Servs.*, 468 Fed. Appx. 952 (Fed. Cir. 2011) (non-precedential opinion).  This presumption is based on the linked propositions that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Human Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013), *mot. for rev. denied,* 142 Fed. Cl. 247, 251-52 (2019), *vacated on other grounds and remanded*, 809 Fed. Appx. 843 (Fed Cir. 2020); *Cucuras v. Sec'y of Health & Human Servs.*, 26 Cl. Ct. 537, 543 (1992) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred"), *aff'd*, 993 F.2d 1525.  As the Federal Circuit noted, the weight afforded to contemporaneous records is due to the fact that they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium." *Cucuras*, 993 F.2d at 1528.

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight.  *Lowrie v. Sec'y of Health & Human Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  Indeed, contemporaneous medical records are generally found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence.  *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir.), *cert. den'd, Murphy v. Sullivan*, 506 U.S. 974, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992) (*citing United States v. United States Gypsum Co.*, 333 U.S. 364, 396, 68 S.Ct. 525, 92 L.Ed. 746 (1948) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).  However, there are situations in which compelling testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell*

8

*v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (*quoting Murphy*, 23 Cl. Ct. at 733).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (*citing Blutstein v. Sec'y of Health & Human Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y Health & Human Servs.*, 110 Fed. Cl. 184, 203–04 (2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

The specific issue of determining the onset of symptoms in a SIRVA case has arisen repeatedly. Important to that point given the short 48-hour onset period identified by the Vaccine Injury Table, the Vaccine Act instructs that the special master may find the time period for the first symptom or manifestation of onset required for a Table Injury is satisfied "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such a period." §300aa-13(b)(2). However, consistent with petitioner's burden of proof overall, that finding must be supported by preponderant evidence. *Id.*

In prior decisions it has been held that neither a delay in seeking treatment, nor a failure to report symptoms to a specialist or emergency room provider prior to later seeking treatment, is necessarily dispositive of whether a petitioner's shoulder pain began within 48 hours of vaccination. *See e.g.*, *Williams v. Secretary of Health & Human Services,* No. 17-1046V, 2020 WL 3579763, at *6 (Fed. Cl. Spec. Mstr. Apr. 1, 2020); *Forman-Franco v. Sec'y of Health & Human Servs.*, No. 15-1479V, 2018 WL 1835203 (Fed. Cl. Spec. Mstr. Feb. 21, 2018); *Tenneson v. Sec'y of Health & Human Servs.*, No. 16-1664V, 2018 WL 3083140 (Fed Cl. Spec. Mstr. Mar. 30, 2018), *mot. rev. denied* 142 Fed. Cl. 329 (2019); *Gurney v. Sec'y of Health & Human Servs.*, No. 17-481V, 2019 WL 2298790 (Fed. Cl. Mar. 19, 2019). However, SIRVA claims often fail when the contemporaneous medical records that do exist reflect a course of treatment inconsistent with an immediate post-vaccination onset or have otherwise been contradictory to petitioner's allegation of immediate post-vaccination onset. *See e.g.*,

9

*Small v. Sec'y of Health & Human Servs.*, No. 15-478V, 2019 WL 6463985, at *12-*13 (Fed. Cl. Spec. Mstr. Nov. 1, 2019); *Demitor v. Sec'y of Health & Human Servs.*, No. 17-564V, 2019 WL 5688822, at *10 (Fed. Cl. Spec. Mstr. Oct. 9, 2019); *see also Lavender v. Sec'y of Health & Human Servs.*, No. 18-1921V, 2021 WL 667187 (Fed. Cl. Spec. Mstr. Jan 25, 2021); *Duesterheft v. Sec'y of Health & Human Servs.*, No. 18-08V, 2021 WL 1097707 (Fed. Cl. Spec. Mstr. Feb. 24, 2021).

### IV.    Parties' Contentions

Petitioner argues that his treating physicians reported onset of left shoulder pain on, or within days of, his vaccination on October 4, 2016. (ECF No. 39, p. 9 (citing to Ex. 2, p. 12; Ex. 6, p.1; Ex. 7, p. 5.)  Petitioner maintains that the medical records along with his written testimony provide preponderant evidence that petitioner's shoulder injury occurred within 48 hours of his flu vaccination on October 4, 2016. (ECF No. 42, p. 5.)

Respondent argues that the evidence does not support an onset of pain within 48 hours of petitioner's flu vaccination, pointing to records noting symptoms beginning 23 days after vaccination. (ECF No. 26, pp. 18-19.)  Specifically, the records indicated that petitioner reported his left arm symptoms beginning in mid-October to November 9, 2016. (*Id.* at 19 (citing Ex. 4, p. 1; Ex. 5, p. 5.)  Respondent also argues that petitioner's pre-vaccination medical condition, mainly his history of cervical radiculitis, is the cause for his post-vaccination symptoms. (*Id.* at 19.)  Respondent states that petitioner's "treatment providers involved in his post-vaccination care connect petitioner's cervical radiculopathy to his post-vaccination symptomology." (*Id.*)  And respondent emphasized that petitioner's objective testing, mainly the x-ray of left shoulder that showed degenerative arthritis, shows that petitioner's current symptoms were all related to a prior condition. (*See* Ex. 3, p. 11; Ex. 9, p. 10.)

### V.    Discussion

When viewing the record as a whole, I do not find preponderant evidence that petitioner had onset of post-vaccination left shoulder pain immediately following his vaccination or within 48 hours of his vaccination.  Petitioner's affidavit testimony and the contemporaneous medical records are at odds.  None of the records immediately following petitioner's vaccination place onset of petitioner's symptoms within 48 hours of the vaccination.  Although, subsequent records do associate onset of shoulder pain with the vaccination, these more remote records are not as reliable as the records immediately following petitioner's flu vaccination.

Of note, the first record following the vaccination at issue was with petitioner's acupuncturist, Dr. Sciamanna, on October 27, 2016, and it records that in addition to neck pain, petitioner reported experiencing left shoulder pain that had begun two months prior and become worse and worse. (Ex. 3, p. 7.)  This places onset more than a month prior to his October 4, 2016 vaccination.  During a November 10, 2016 appointment with Fred Chang, D.C., L.Ac, petitioner likewise described an insidious

onset of neck pain that sometimes radiated into his arm.  (Ex. 4, pp. 1-2.)  Shoulder depression and Jackson compression tests were positive on the left.  (*Id.* at 1.)  With regard to onset, this record indicates that "[p]ain was not immediate and intense it has been there for quite some time every time they go to work there is strain on the neck and upper back."  (*Id.* at 1.)

To the extent petitioner reported shoulder pain from any separate pathology unrelated to his neck, he reported on November 15, 2016, that he began experiencing shoulder pain that he attributed to being "manipulated a little too hard," during this last chiropractic treatment.  (Ex. 3, p. 5.)  He specifically described experiencing a "crack" in his shoulder at that time.  (*Id.*)  During petitioner's November 29, 2016 appointment petitioner reiterated that he had been having progressive shoulder symptoms for two weeks that he attributed to aggravation by a chiropractic treatment. (Ex. 10, p. 172.)   It was not until four months post-vaccination, when he saw Dr. Ressler on February 2, 2017, that petitioner began associating his symptoms with his flu vaccination to any of his medical providers.  (Ex. 2, p. 12.)  None of the initial records following petitioner's vaccination support an immediate onset of post-vaccination pain or onset of pain within 48 hours of vaccination.

Importantly, these records are not merely silent as to onset, but rather explicitly contradict petitioner's allegation of onset.  In particular, as described above, petitioner's earliest post-vaccination medical record indicates that petitioner had neck and shoulder pain prior to his receipt of the vaccination at issue.  Additionally, to the extent petitioner attributed separate shoulder pain to any exacerbating event, he described a specific chiropractic appointment during which he experienced a "crack" of his shoulder that started his shoulder pain rather than his vaccination.  (Ex. 3, p. 5.)  Moreover, because these contemporaneous records reflect histories taken by multiple medical providers, it is less likely the failure to record any immediate post-vaccination onset was due to deficient recordkeeping.  Additionally, the records reflect affirmative reports, such as the specific reference to petitioner's shoulder cracking during chiropractic treatment, that cannot be explained by mere omission.  Rather, petitioner's seeming inability to contemporaneously pin-point onset, and his attribution of his shoulder pain to chiropractic manipulation as an aggravating event instead of vaccination, further suggests that onset was more likely to be insidious and beginning as early as a month prior to vaccination, as observed in multiple records, rather than specifically within 48 hours of vaccination.

Notably, petitioner's affidavit likewise describes a course of progressive shoulder pain beginning in the autumn of 2016.  (Ex. 17, p. 2.)  However, his specific description of his pain beginning immediately after vaccination remains at odds with his contemporaneous reports to multiple care providers.  Significantly, other of petitioner's recollections regarding his medical history also appear to be unreliable compared to his contemporaneous medical records.  In his affidavit, petitioner avers with regard to his prior motor vehicle accident injury that "[b]y 2011, I was *completely asymptomatic* and had returned to the gym at my previous frequency, at least three times a week, while also attending an additional evening of Pilates."  (Ex. 17, p. 1 (emphasis added).)  In

11

contrast, petitioner's orthopedic medical records reflect that as of May 17, 2012, about a year and a half after he suggests he was completely asymptomatic, he reported persistent spasms in the back attributable to the accident. He specifically reported that "he has never been able to relax his back muscles since the accident." (Ex. 16, p. 4.) "Significant" and "unchanged" spasms were confirmed on physical examination and a follow up MRI and TENS unit for home use were recommended. (*Id.*)

Aside from his own attestation, petitioner provided a letter from Dr. Gigliotti, that was dated March 12, 2020, almost four years after the vaccination at issue. Dr. Gigliotti recalled having two phone conversations with petitioner following his flu vaccination and explained that there were no records because the calls occurred after hours. (Ex. 21.) Dr. Gigliotti indicated that petitioner complained of extreme left shoulder pain and prescribed Motrin and then prednisone. The basis for Dr. Gigliotti's recollection of those conversations from four years prior is not indicated. Nor does Dr. Gigliotti explain how petitioner had after-hours access to his physician. And, in fact, the phone notes which were contemporaneously kept, failed to mention any onset of left shoulder pain or any pain that differed from petitioner's usual course of treatment or care. (Ex. 10, pp. 168-89.) When petitioner subsequently followed up for an in person appointment with Dr. Gigliotti on November 29, 2016 for neck and shoulder pain, Dr. Gigliotti not only failed to record any history consistent with his much later letter, he also recorded a history that petitioner had been experiencing two weeks of progressive symptoms aggravated by chiropractic treatment, but with no trauma. (Ex. 10, p. 172.) Special Masters may reasonably credit a physician's earlier records over a later, contradictory letter of clarification. *Milik v. Sec'y of Health & Human Servs.*, 822 F.3d 1367, 1380-81 (Fed. Cir. 2016).

Even assuming that Dr. Gigliotti's recollection as stated in his letter is credible and reliable, the conversations took place almost a week post-vaccination and Dr. Gigliotti failed to indicate when the onset of pain occurred. Specifically, Dr. Gigliotti stated that petitioner had mentioned onset being "several days" after his vaccination, which is not adequate to corroborate onset within 48 hours and could be interpreted as supporting onset outside of the 48-hour post-vaccination period. The remaining witness statements corroborate petitioner's ongoing shoulder pain, but likewise do not help to resolve the question of onset because the affidavits focus on when petitioner spoke about his shoulder pain rather than whether the pain was immediate. In short, the recollections contained in these statements are not "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3.

Petitioner did not provide any reason to doubt the accuracy of the initial treatment records generated during the period following his vaccination. Nor did he explain his delay in attributing his left shoulder pain to his flu vaccination. Several of the appointments at which petitioner failed to associate his shoulder pain with vaccination, or place onset at the time of vaccination, occurred in mid- to late November, after Ms. Jones suggested he may have a SIRVA. (Ex. 24.) It is not readily apparent why petitioner would opt not to discuss with his physicians and other treatment providers what he purportedly believed to be the correct etiology of the condition for which he was

seeking treatment.  *See Cucuras*, 993 F.2d at 1528 (stating that contemporaneous records "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions.  With proper treatment hanging in the balance, accuracy has an extra premium.").

Petitioner emphasizes that when he reported to South Jersey Pain on February 2, 2017, he reported that had soreness at the site of injection with tingling on his left arm that radiated to his finger after flu shot in October.  (Ex. 13, p. 8.)  Thereafter, petitioner repeatedly associated his condition to his flu vaccination.  However, these histories began almost four months post-vaccination, and, more significantly, after petitioner had already reported a different history of onset in more contemporaneous records to multiple physicians.  I find the contemporaneous records in October and November 2016 relating to his treatment during the period following his vaccination and following the onset of his shoulder pain much more accurate than the records for his treatment in 2017.  *See e.g.*, *R.K. v. Sec'y of Health & Human Servs.*, No. 03-632V, 2015 WL 10936123, at *76 (Fed. Cl. Spec. Mstr. Sept. 28, 2015) (holding that more remote histories of illness do not have sufficient indicia of reliability to be credited over conflicting contemporaneous medical records); *see also e.g.*, *Vergara v. Sec'y of Health & Human Servs.*, 08-882V, 2014 WL 2795491, *4 (Fed. Cl. Spec. Mstr May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those *recorded in later medical histories*, affidavits, or trial testimony" (emphasis added).).

### VI.     Conclusion

In light of the above, there is not preponderant evidence that petitioner experienced left shoulder pain within 48 hours of his October 4, 2016 flu vaccination.  Accordingly, petitioner has not met his burden of proof with respect to a Table Injury of SIRVA as these findings prevent him from satisfying the QAI definition of SIRVA.  42 C.F.R. §100.3(c)(10).

**IT IS SO ORDERED.**

<u>s/Daniel T. Horner</u>
Daniel T. Horner
Special Master
